UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

|  |  |  |
|---|---|---|
| INGLESIDE EQUITY GROUP, LP, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Case No. 2:13-CV-53 |
| v. | : | |
| | : | |
| CITY OF ST. ALBANS, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## Opinion and Order

Plaintiff Ingleside Equity Group ("Ingleside") brings suit against the City of St. Albans ("City") for its refusal to grant a wastewater allocation to its proposed development in the Town of St. Albans ("Town"). Plaintiff entered into a Purchase and Sale Agreement in 2012 to sell and develop the parcel of land in question; the Agreement was contingent upon receiving a water and wastewater allocation from the City. The City denied Ingleside's allocation request based on a 2011 Moratorium on new water and wastewater allocations outside the City, and Ingleside lost the contract. Because the Moratorium has an exception for a specific district within the Town (which Ingleside's parcel is not in), Ingleside claims that the City acted discriminatorily when it denied the allocation request. Ingleside filed suit against the City asserting that (1) the City unlawfully discriminated against Ingleside in violation of Chapter 1

1

Article 7 of the Vermont Constitution and its equal protection rights under the Fourteenth Amendment; (2) the City's actions amounted to unlawful extraterritorial zoning and were therefore *ultra vires*; and (3) the City breached its statutory obligations under Title 24.

Before the Court are cross motions for summary judgment. For the reasons stated below, the Court **denies** Ingleside's motion for summary judgment, ECF No. 28.  The Court **grants in part and denies in part** the City's motion for summary judgment, ECF No. 27.  Summary judgment is **granted** as to the state law claims but **denied** as to the Equal Protection claim.  This claim must be determined by a finder of fact.

**BACKGROUND**

**I. Ingleside Equity**

On or about June 6, 2012, Ingleside entered into a Purchase and Sale Agreement ("Agreement") with John P. Larkin for the sale of approximately two acres of land located in the Town. The parcel of land is located near Exit 19 off I-89 at Route 104 and was under contract to be sold and developed as a Hampton Inn ("Hampton Inn Parcel").  The Agreement was contingent on Ingleside receiving a conditional use permit ("CUP") from the Town and a wastewater and potable water allocation from the City.  Ingleside received a CUP from the Town on August 31, 2012.

On January 31, 2013, the City sent a letter notifying Ingleside that its request for a water and wastewater allocation had been denied pursuant to the City's Moratorium on new water and wastewater applications for properties located outside the City.  The Moratorium, adopted on May 2, 2011, prohibits the City from providing new water and/or wastewater allocations to anyone outside of the legal limits of the City, with the exception of "properties that are part of the Route 7 North Sewer District ("Sewer District") as adopted by the Town of St. Albans on August 27, 2001."  *See* Moratorium § 3 (City's SUF Ex. 2).  Because the Hampton Inn Parcel is located outside the City and the Sewer District, the City found that the allocation was proscribed by the Moratorium and refused Ingleside's application on this basis.

Prior to the enactment of the Moratorium, the City frequently granted allocation applications to Town property owners outside the Sewer District, including Ingleside.  In 2005, Ingleside completed a project on property located at I-89 and Route 104 for a Co-Op and Maplefields Store (also known as the "Milk & Maple" project).  The Milk & Maple project is located in the same development as the Hampton Inn Parcel.  The City granted Ingleside a water and wastewater allocation for the Milk & Maple project in 1999.  Even though Ingleside only received an allocation specifically for the Milk & Maple

3

project, when Ingleside received this allocation, it built water and wastewater infrastructure sufficient to serve the projected needs of the entire development area.  This infrastructure cost Ingleside $430,994.27.  According to Ingleside, it built this substantial infrastructure based on the understanding that it would be permitted to seek allocations from the City for future projects in the development area.

Ingleside argues that this reliance was reasonable based on several alleged representations made by the City to this effect. In 2004, Ingleside obtained Act 250 approval for a development plan based in part, according to Ingleside, on the representation that it would be serviced by the City's water and wastewater facilities.  It is undisputed that the City was a noticed party in the Act 250 proceedings.  Ingleside also contends that it built this infrastructure pursuant to construction requirements set by the City.  Specifically, Ingleside submits that the City requested that Plaintiffs include a 10-inch main sewer and 8-inch water main in their infrastructure in order to accommodate the projected future needs of the development.  Because these mains would not have been necessary to service solely the Milk & Maple allocation, Ingleside argues that it relied on the City's representations that it would be permitted to seek allocations for future developments when it invested in this infrastructure.

4

According to the City, it did not require Ingleside to use a specific sized pipe for the infrastructure.  Then-City Manager William Cioffi stated in an affidavit that he never indicated to Ingleside that the City required a specific size of infrastructure or pipe, nor did anyone from the Department of Public Works.  In fact, he stated that "it is not regular practice for the City of St. Albans to determine the required sizing of pipes for infrastructure construction."  Cioffi Aff. ¶7.  Instead, sizing requirements are made by the state through the Act 250 process, and engineers for specific projects would make recommendations for sizing depending on the particular details of a given project.

In addition to these 2005 projects, Plaintiff alleges that the City denied permits to Ingleside's owners regarding unrelated projects during the 1990s based on personal animus.

**II.  The Moratorium**

The Moratorium, adopted on May 2, 2011, prohibits the City from providing new water and/or wastewater allocations to anyone outside of the legal limits of the City, with the exception of "properties that are part of the Route 7 North Sewer District ("Sewer District") as adopted by the Town of St. Albans on August 27, 2001."  *See* Moratorium § 3.  The Moratorium also provides that "allocations that were previously granted outside the legal limits of the City will not be renewed upon expiration

5

unless the property is located in the Route 7 North Sewer District." *Id.* § 6.

The Moratorium was created with the understanding that the City has no duty to provide such services to Town residents except as modified by "specific agreement to do so," such as in the case of the Sewer District. It contains an outline of why it was enacted, in particular, it cites the anticipated costs to upgrade the City's water treatment plant weighed against the fact that the Town does not contribute to the tax base that would pay for such upgrades. The concerns underlying the Moratorium also include that:

- The City of St. Albans owns the water and wastewater infrastructure but presently has no long term agreement to provide water and sewer services to the Town of St. Albans. The Town has no obligation to help upgrade the plant to accommodate the demands of its residents. Moratorium § 2 ¶ 4.

- The City is experiencing an erosion of its tax base through businesses that are choosing to expand in the Town rather than the City while still accessing the City's water and wastewater. *Id.* ¶ 8.

- In the absence of a long term agreement, granting water and wastewater allocations in the Town of St. Albans (a) increases the likelihood that City ratepayers will have to pay more to reduce phosphorous discharges in order to facilitate growth in the Town; and (b) decreases the competitiveness of City development lots when the chief advantage of a City property (water and sewer) is also available in the Town. *Id.* ¶ 9.

Based on these findings and others, the Moratorium prohibits the granting of new water or wastewater allocations or renewals

outside the legal limits of the City except to properties that are part of the Route 7 North Sewer District. *Id.* §3, 16.  The Moratorium itself does not explain *why* the Sewer District is exempt from its reach.

The Sewer District was established through the Town of St. Albans Sewer Allocation Ordinance, adopted August 27, 2001.  The Ordinance indicates that the Town established a sewer district subject to an initial one-year wastewater allocation from the City.  The allocation reserved 100,000 gallons per day ("gpd") of capacity for the Sewer District.  According to a deposition of the current City Manager, Dominic Cloud, in return for the City's grant of 100,000 gpd of wastewater capacity, the Town "created a special district within their town, built the infrastructure, and levied a tax assessment against those properties to service the bonds that paid for the construction of the district." Cloud Dep. 8:14-9:5.  The City concedes that there is no specific, written agreement governing this arrangement.  However, the course of dealing between the City and the Town has since been that the Water District has a "reservation" of up to 100,000 gpd in capacity, and the City maintains that it has observed this reservation consistently since 2001.

Because of this agreement, the City contends that properties located in the Sewer District differ from other Town

7

properties that are located outside the Sewer District.
According to the City, this 2001 wastewater reserve fostered
reliance by properties located within the Sewer District.  As
Cloud testified, there was "extensive on-the-ground investment
by private parties on the belief . . . that the two local
governments [had] agreed to provide water and wastewater
services within the Route 7 North Sewer District."  Cloud Dep.
9:13-24.  This reliance and resulting investment made these
properties different from the rest of the Town where there was
never any promise to provide such services.  Thus, when the
Moratorium was enacted, this reliance was taken into account.
According to Cloud, the exemption was included in the Moratorium
because "trying to undo what had been in place for over a decade
was not something that we gave a whole lot of thought to or
seriously considered [in passing the Moratorium].  It was so
embedded within the framework and the rules of the game as to
how development occurs in [the area]."  Cloud Dep. 9:18-24.

Ingleside counters that the Moratorium does not state why
the District was excluded, nor does the City present evidence of
any agreement regarding the District other than the Ordinance
itself.  While Cloud's deposition presents the aforementioned
explanation, this explanation is not included in the text of the
Moratorium.  However, Ingleside does not actually dispute the
initial 100,000 gpd allocation, though it does point out that

8

the Sewer District never renewed its allocation after it expired in December 2002.

Other than the agreement to reserve wastewater capacity for the Sewer District, the City has no obligation to provide water or wastewater to the residents of the Town outside the District such as the Hampton Inn Parcel.  It is undisputed that, since the Moratorium was enacted, all applications for water and/or wastewater allocations regarding properties located outside the City have been denied unless they were located in the District or they had a preexisting allocation.  At least two property owners in the District have taken advantage of their exclusion from the Moratorium and received allocations since the Moratorium went into effect.

## III. Legal Proceedings

After the City refused to grant Ingleside its requested allocation, Ingleside filed suit against the City alleging that (1) the City unlawfully discriminated against Ingleside in violation of Chapter 1 Article 7 of the Vermont Constitution and its equal protection rights under the Fourteenth Amendment; (2) that the allocation resulted in *ultra vires* and unlawful extraterritorial zoning; and (3) that the City breached its statutory obligations under Title 24.  Before the Court are cross motions for summary judgment.

**DISCUSSION**

## I. Standard of Review

The parties have cross moved for summary judgment under Rule 56.  The Court may grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.  Summary judgment is appropriate where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  Where there are cross motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC*, 628 F.3d 46, 51 (2d Cir. 2010) (quotations omitted).

## II.  Equal Protection Clause of Fourteenth Amendment

Ingleside's first claim is based on the argument that the allocation denial constituted unlawful discrimination under the Equal Protection Clause of the Fourteenth Amendment.  The Equal Protection Clause prohibits states from denying any person the equal protection of the laws.  U.S. Const. amend. XIV, § 1.  It is traditionally applied to classifications that treat certain groups differently than others; however, the Supreme Court has

10

allowed "class of one" claims where a single individual can claim a violation of equal protection based on arbitrary disparate treatment. *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Fortress Bible Church v. Feiner*, 694 F.3d 208, 221 (2012). "Class of one" equal protection claims are proper where a plaintiff can demonstrate that it "'has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Ruston v. Town Bd. for the Town of Skaneateles*, 610 F.3d 55, 58 (2d Cir. 2010) (quoting *Olech*, 528 U.S. at 564). Here, Ingleside challenges the denial of its allocation and seeks to bring such a class-of-one discrimination claim against the City.

"[C]lass-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Clubside, Inc. v. Valentin,* 468 F.3d 144, 159 (2d Cir. 2006). Thus, to succeed on its claim, Ingleside must establish that "'(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants

acted on the basis of a mistake.'"  *Ruston,* 610 F.3d at 60
(quoting *Valentin*, 468 F.3d at 159).

As a general rule, whether persons or businesses are
similarly situated is a factual issue that should be submitted
to the jury.  *See, e.g.*, *Graham v. Long Island R.R.,* 230 F.3d
34, 39 (2d Cir. 2000) ("Whether two employees are similarly
situated ordinarily presents a question of fact for the jury.");
*Kirschner v. Zoning Bd. of Appeals of Valley Stream,* 924 F.Supp.
385, 394 (E.D.N.Y. 1996) (holding that issue of whether two
shops are similarly situated is "classic" issue of fact
precluding summary judgment).  However, the Second Circuit has
found that "this rule is not absolute" and thus a court may
grant summary judgment "where it is clear that no reasonable
jury could find the similarly situated prong met."  *Harlen
Associates v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d
Cir. 2001).

In support of its claim, Ingleside argues that the Hampton
Inn Parcel is similar in all material respects to developments
located within the Sewer District, and that there is no rational
justification to support the City's wastewater allocation to one
and exclusion of the other.  In particular, it notes that both
the properties within the Sewer District and the Hampton Inn
Parcel are

> (i) located in Regional and Town of St. Albans Designated
> Growth Districts directly off of Interstate 89; (ii) have
> approved Act 250 permits for development of multiple
> parcels; (iii) have received Town approval for commercial
> uses; (iv) have water and wastewater infrastructure that
> was built in reliance on allocations being granted; (v)
> have infrastructure which can service additional
> development; (vi) have owners who followed the same
> required procedures to apply for allocations; and (vii)
> are not benefited by any contract which required the City
> to grant allocations.

Pl.'s Mot. Summ. J. 5.  In opposition, the City contends that

Plaintiff was not similarly situated because the Hampton Inn

Parcel is subject to the Moratorium while developments in the

District are not.  Because it is undisputed that the Moratorium

was the basis for the denial of the allocation, the

determinative issues are the basis for the exemption and whether

this basis differentiates businesses in the Sewer District from

the Hampton Inn Parcel such that it makes them dissimilarly

situated.

On this point, there are numerous factual disputes that

preclude summary judgment in favor of either party.  First, the

reason for the exemption is disputed.  The City contends that

the Sewer District was created subject to a commitment by the

City to reserve 100,000 gpd to service the properties located in

the Sewer District and that there was

> extensive on-the-ground investment by private parties
> on the belief . . . that the two local governments
> [had] agreed to provide water and wastewater services
> within the Route 7 North Sewer District, and trying to
> undo what had been in place for over a decade was not
> something that we gave a whole lot of thought to or

13

seriously considered [in passing the Moratorium].  It
was so embedded within the framework and the rules of
the game as to how development occurs in [the area].

Cloud Dep. 9:13-24.  Thus, according to the City, the exception

was included in the Moratorium implicitly on the grounds that

the District had acted and invested in reliance on the 100,000

gpd allocation from 2001.

Plaintiff disputes the City's reliance-based explanation on

several grounds.  Ingleside notes that while the Moratorium sets

out several specific reasons for its enactment, it does not

actually provide any express bases for excluding the Route 7

North Sewer District.  This alone raises a factual dispute as to

the actual reasons behind the exemption.  Furthermore, while

Ingleside does not dispute the Sewer District's initial 100,000

gpd allocation, it notes that the City has provided no written

agreement or document which expressly grants an extension of the

original allocation; the reservation has not been renewed since

it expired in 2002.  Thus, in addition to challenging the

reasons underlying the original exemption, Ingleside also

disputes whether the supposed reliance interest justifies the

Sewer District's exemption from the Moratorium in light of the

fact that the reservation no longer exists.  Without such a

reliance interest, Ingleside contends, there is no reason to

find the Hampton Inn Parcel dissimilarly situated.  This is

another factual dispute that precludes summary judgment at this juncture.

Even if the Court were to concede the City's reliance explanation, Ingleside puts forth facts suggesting that it had similarly relied on representations made by the City. Ingleside cites the allocations it received for its Milk & Maple project and its ensuing investments in infrastructure, on the theory that it *also* relied on past promises from the City as a result of these allocations.  At the time of the Milk & Maple project, Ingleside invested $430,994.27 in infrastructure that far exceeded what was necessary for its initial development. According to Ingleside, this investment was based on the understanding that it would be able to seek wastewater allocations from the City for future developments.  Ingleside contends that this understanding arose from the initial allocation to Milk & Maple, the City's alleged piping requirements for the infrastructure, and the City's participation in the Act 250 proceedings.  While the City disputes whether its agents ever made such indications to Ingleside, this is another factual dispute that makes judgment as a matter of law on this issue premature.

Thus, there are clearly numerous factual disputes outstanding with regard to whether Ingleside was similarly situated to the Sewer District.  Because the determination of

15

whether a party is similarly situated should be made by a finder of fact except where "where it is clear that no reasonable jury could find the similarly situated prong met," *Harlen Associates*, 273 F.3d at 499 n.2, Plaintiff's Equal Protection claims cannot be decided at summary judgment in favor of either party.

## III. Common Benefits Clause (Vermont Constitution)

Ingleside brings similar discrimination claims under the Common Benefits Clause, Chapter 1, Article 7 of the Vermont Constitution, which guarantees the right of the people to a government that does not favor any one person over another. Vt. Const. ch. I, art. 7 ("[G]overnment is, or ought to be, instituted for the common benefit, protection, and security of the people, nation, or community, and not for the particular emolument or advantage of any single person, family, or set of persons."). A plaintiff seeking damages for violation of the Common Benefits Clause must prove three "core" elements:

> First, of course, a plaintiff must show the denial of a common benefit. In doing so, the plaintiff must show disparate and arbitrary treatment when compared to others similarly situated. Second, the plaintiff must show that the denial directly favors another particular individual or group. Finally, because we must defer to any "reasonable and just" basis supporting a discretionary judgment by a governmental decisionmaker, a plaintiff must demonstrate not only that that the decision was wholly irrational and arbitrary, but also that it was actuated by personal motives unrelated to the duties of the defendant's official position, such as ill will, vindictiveness, or financial gain.

16

*In re Town Highway No. 20*, 2012 VT 17, ¶ 37, 45 A.3d 54, 68 (2012) (quoting *Baker v. State*, 744 A.2d 864, 879 (Vt. 1999)). The court in *Town Highway No. 20* went on to explain that this third factor requires a "showing that the discriminatory treatment of the plaintiff was not only irrational, but motivated solely by an actual desire to harm the plaintiff or by other unjustified personal motives such as self-enrichment or the enrichment of others." *Id.* ¶ 38.[1]

Ingleside's claim under the Common Benefits Clause plainly fails on the third factor as a matter of law because even viewing the evidence in the light most favorable to Ingleside, the record does not suggest that the allocation was denied based on an "unjustified personal motive" or desire to harm — instead, it is undisputed that the Moratorium formed the basis of the refusal, and there is no evidence on the record to suggest that the Moratorium was driven by personal motives.

[1] The Vermont Supreme Court, in adopting this standard, relied on case law in the federal courts regarding "class-of-one" equal protection cases. While the Supreme Court has not required such a strenuous showing, Justice Breyer in a concurrence noted that "vindictive action, illegitimate animus, or ill will" is necessary in the class-of-one context. *Olech*, 528 U.S. at 566 (Breyer, J., concurring). Since *Olech*, several circuit courts have applied Breyer's reasoning to "class of one" equal protection claims, though none in this circuit. *See, e.g.*, *Nevel v. Vill. Of Schaumburg*, 297 F.3d 673, 681 (7th Cir. 2002) (requiring "totally illegitimate animus" in class-of-one equal protection claim); *Lakeside Builders, Inc. v. Planning Bd. of Town of Franklin*, No. Civ.A. 00-12170-GAO, 2002 WL 31655250, at *4 (D. Mass. Mar. 21, 2002) (requiring class-of-one plaintiff to show deprivation based on "reasons of a personal or improper nature"). Absent guidance from this circuit, the Court declines to apply this strenuous standard to Plaintiff's federal constitutional claim; however, as it has been adopted by the Vermont Supreme Court, the Court will apply this standard to Plaintiff's claims arising under the Vermont Constitution.

17

While Ingleside introduces evidence of past animus by the City against Plaintiff, such as past instances in which Ingleside's owners were denied permits for unrelated developments, Ingleside does not allege that this animus formed the basis for the Moratorium.  Ingleside provides no evidence, nor does it even allege, that the Moratorium or the exemption for the Sewer District was "actuated by personal motives" or ill will.  Instead, in its own Statement of Undisputed Facts, Ingleside cites testimony stating that exception was included because of the "extensive on-the-ground investment by private parties on the belief" that they were granted a wastewater reservation.  Pl.'s SUF ¶ 44.  Thus, even when viewing the facts in the light most favorable to Ingleside, it cannot sustain a claim for damages under the Common Benefits Clause, and the Court grants summary judgment to the City on this claim.

## IV.  Unlawful Extraterritorial Zoning under *Smith*

In addition to its federal and state constitutional claims, Ingleside also asserts that the City's actions are unlawful and *ultra vires* under *Smith v. City of St. Albans*, No. S360-89 FC (Vt. Super. Ct., May 17, 1994).  In *Smith*, the Vermont Superior Court held that the City may not make wastewater allocation decisions that amount to extraterritorial zoning.  While it is undisputed that the City has the authority to provide and discontinue water and sewer to towns outside the City, *see* Vt.

Stat. Ann. tit. 24, §§ 3410, 3503, the *Smith* court found that the City was prohibited from differentiating unreasonably in rates or manners of services when it elects to serve non-residents. *Id.* (explaining that "a municipality choosing to supply a utility service beyond its borders can discriminate between applicants for utility services who otherwise appear to be similarly situated when there is some reasonable basis for differentiation between the applicants with regard to the services sought"). The court further held that the City's basis for refusal "must be related to the service sought, and not some collateral matter." *Id.* Ingleside thus claims that the City violated *Smith* here because its refusal to grant an allocation to Ingleside was based, in its view, on considerations unrelated to capacity.

It is undisputed that the Moratorium contemplates some issues unrelated to capacity. However, *Smith* does not actually stand for a broad prohibition on *any* consideration of non-capacity considerations. At most, it indicates that allocation decisions cannot be based *solely* on collateral issues. In *Smith*, the City denied approval of a water and sewer allocation for a project in the Town based on traffic and concentration concerns; its decision made no mention of wastewater capacity. The court found this impermissible not just because the decision was based on collateral concerns, but particularly because the

19

denial was based on *zoning* considerations and the City is not permitted to make zoning decisions outside its borders.  The court also placed great emphasis on the fact that this was the first time a Town project had ever been turned down for a wastewater allocation, and there were substantial indicia that this unusual move was based on personal ill will.  One of the alderpersons involved in making the decision was a neighbor to the applicant development project.  This alderperson had personally mounted an opposition to the project, yet did not recuse himself from the allocation decision for conflict of interest.  Because of all of these factors, the court found that the City's allocation denial constituted an unlawful and *ultra vires* action.

Here, Ingleside claims that the City has violated *Smith* by granting allocations to developments in the exempt Sewer District but not outside it.  Ingleside contends that because the Moratorium contemplates some criteria unrelated to capacity concerns, it also results in impermissible zoning outside the City limits as proscribed by *Smith*.  However, this case is distinguishable from *Smith* on several bases.  First, it is undisputed that the City has the authority to adopt such a Moratorium.  Vt. Stat. Ann. tit. 24A, §11-18(11)-(14),(16); Vt. Stat. Ann. tit. 24, §§3625, 3313.  The City is not required to provide wastewater allocations to properties located outside the

City.  Second, the Moratorium itself is not violative of *Smith*
because it does not result in de facto extraterritorial zoning.
The Moratorium does not discuss the types of considerations the
court rejected in *Smith* (such as traffic and concentration) and
indeed lists many underlying justifications related to capacity,
such as the concern that the wastewater plant would require
upgrades and expansions that would not be covered by the Town
tax base.

Most importantly, the special exemption for the Sewer
District also does not amount to extraterritorial zoning.
Unlike in *Smith* where zoning-type considerations formed the
basis of the decision, here the facts indicate that the
exemption was based on the District's reliance on the initial
allocation.  Cloud's deposition makes clear that the District
would not have been exempt absent the District's longstanding
reliance on the allocation it had already been granted by the
City and Ingleside does not present any evidence to dispute this
fact.  Thus, neither the Moratorium nor the Sewer District
exemption amount to extraterritorial zoning.  Finally, it is
undisputed that the denial of the allocation was based solely on
the Moratorium, which means that any concerns regarding personal
ill will — a significant factor in *Smith* — are not at stake
here.  Thus, even viewing the facts in the light most favorable
to Ingleside, the Moratorium does not constitute the

21

extraterritorial zoning that the Superior Court deemed
impermissible in *Smith* and summary judgment is granted to the
City on this claim.

## V. Breach of obligations under Title 24

In its final claim, Ingleside asserts that the City
breached its statutory obligations under Title 24.  Under
Vermont law, municipalities have the authority to contract for
sewage disposal with any corporation or individual, and may
regulate such service.  *See* Vt. Stat. Ann. tit. 24, §§3611(a),
3305; Vt. Stat. Ann. tit. 24A, §§11(18)(11-16).  Such regulation
must be "fair, equitable, and reasonable." *Handy v. Rutland*,
598 A.2d 114, 118 (Vt. 1990).  The Vermont Supreme Court has
found that it is inequitable or discriminatory for a City to
charge different rates to similarly situated users.  *Id.* at 117.
Ingleside thus argues that the City has violated Title 24
because the court's holding in *Handy*, when read in conjunction
with *In re Town Highway No. 20*, "clearly establish that a
municipality may not discriminate against similarly situated
parties when it provides services pursuant to Vermont's
Constitution and common law."  Pl.'s Mot. Summ. J. 11.

Both parties concede that the City has the authority to
enact a moratorium on allocations outside the City.  Thus,
Ingleside is not claiming that the Moratorium itself is
unlawful.  Instead, Ingleside's Title 24 claim turns on whether

the City discriminated against similarly situated parties when
it granted the exemption to the Sewer District and denied the
allocation to the Hampton Inn Parcel.  As explained above, the
Vermont Supreme Court has applied a stringent standard to such
discrimination claims under the Common Benefits clause.  *In re
Town Highway No. 20*, 2012 VT 17 ¶ 37, 45 A.3d at 68.  As the
Court has already determined that Ingleside cannot sustain its
claims under the Vermont Constitution, its claims under Title 24
on the same theory must also fail.  The Court therefore grants
summary judgment to the City as to Ingleside's Title 24 claims.

**CONCLUSION**

The Court **denies** Ingleside's motion for summary judgment in
full and **grants in part and denies in part** the City's motion for
summary judgment.  Summary judgment is **granted** to the City with
regard to Ingleside's state law claims, and these claims are
dismissed.  However, summary judgment is **denied** with regard to
the Equal Protection claim because this claim implicates factual
questions that must be determined by a finder of fact.

DATED at Burlington, in the District of Vermont, this 21st
day of May, 2014.

/s/William K. Sessions III
William K. Sessions III
United States District Judge