**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF VERMONT**

INGLESIDE EQUITY GROUP, LP,       :
                                  :
         Plaintiff,               :
                                  :        Case No. 2:13-cv-53
    v.                            :
                                  :
CITY OF ST. ALBANS,               :
                                  :
         Defendant.               :

<u>**Memorandum of Decision**</u>

Plaintiff Ingleside Equity Group, LP ("Ingleside") brought this suit against the City of St. Albans ("City") because the City refused to grant a water and wastewater allocation to service a parcel of its property in the Town of St. Albans ("Town").  The City denied Ingleside's request on the basis of a 2011 moratorium on new allocations outside of the City limits. The moratorium, however, has an exception for a specific district within the Town referred to as the "sewer district." Ingleside's parcel is located in the Town but outside of that district.

Ingleside initially asserted that 1) the City unlawfully discriminated against Ingleside in violation of Chapter 1 Article 7 of the Vermont Constitution and its equal protection rights under the Fourteenth Amendment, 2) the City's actions amounted to unlawful extraterritorial zoning and were therefore

1

*ultra vires*, and 3) the City breached its statutory obligations under Title 24. The parties filed cross motions for summary judgment. The Court denied Ingleside's motion for summary judgment and granted summary judgment to the City with respect to Ingleside's state law claims. The Court denied summary judgment with respect to Ingleside's equal protection claim, which is a "class of one claim" requiring Ingleside to prove that the City intentionally treated it differently from others similarly situated and that there is no rational basis for the difference in treatment. ECF No. 35. Ingleside's "class of one" claim is the only claim before the Court.

The Court conducted a bench trial on October 28 and 29, 2014. Based on the testimony of witnesses, all of the evidence submitted, and arguments of counsel, the Court makes the following findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure. In brief, the Court concludes that Ingleside's property was not similarly situated to the sewer district, that excepting the sewer district from the moratorium was justified by a legitimate governmental policy, and that the City did not intentionally single out Ingleside's parcel in any way. Accordingly, the Court will enter judgment in favor of the Defendant.

I.   **Findings of Fact**

    A. **Early Projects and Related Litigation**

Over a period of several years, Sam Smith and his wife, Rachel Smith, have worked together to help Mr. Smith's[1] parents, Edwin and Avis Smith, develop land that was previously the site of the family's dairy farm.[2]  First, the Smiths developed seven residential lots located off of the Thorpe Avenue Extension in 1987.  During this process they contacted then City Manager Bill Cioffi and requested water and wastewater allocations, which Mr. Cioffi approved.  Mr. Cioffi made clear that the City owned and controlled the lines and that any lines attached to the City's system became City property regardless of whether they were located in the Town or City.  Mr. Smith did all of the negotiating with the City on behalf of his parents.

Next in 1987, the Smiths proposed a fourteen-lot development directly to the east of those first seven lots. This project was known as Sunset Terrace.  The project triggered Act 250 jurisdiction.  As part of the Act 250 application, Mr. Smith once again requested and received a letter from the City approving the hookups for water and wastewater in December of 1987.  The Environmental Board approved the application but

---

[1] Unless otherwise specified "Mr. Smith" refers to Sam Smith.

[2] Ingleside is a limited partnership made up of the heirs of Edwin and Avis Smith.

included a condition stating that prior to any further development or subdivision the Smiths would be required to prepare and submit a conceptual master plan for the rest of the farm.

While Sunset Terrace was in Act 250 proceedings in 1988, the Smiths began developing a retirement community called Grice Brook, a forty-eight unit garden-style condominium project on ten acres.  Mr. Smith once again contacted Mr. Cioffi to tell him that he was interested in using City water and wastewater services for this project.  Mr. Cioffi told Mr. Smith that this time he would have to present the plan to the St. Albans City Planning Commission even though he had not had to do this previously for either the Thorpe Avenue Extension project or Sunset Terrace.  Mr. Smith presented his request for allocations to the Regular Monthly Meeting of the City Planning Commission on August 15, 1988.

Peter Deslauriers, a fellow Town resident who lives on Thorpe Avenue, was a repeat player in the Smiths' interactions with the City.  He frequently attempted to thwart their development plans both before and after he eventually became an Alderperson because he was concerned about their effect on his neighborhood.

During the hearing regarding Grice Brook Mr. Deslauriers spearheaded opposition to the project on behalf of himself and

4

others in the neighborhood.  Originally Mr. Smith proposed
Thorpe Avenue as the point of access to the Grice Brook
development.  Mr. Deslauriers voiced his and other residents'
concern that the development would affect traffic.  The meeting
was recessed.  On August 29, 1988 a Special Meeting of the City
Planning Commission was convened.  It recommended that the City
not allow the Grice Brook project to use Thorpe Avenue.  The
City Council subsequently denied the Smiths use of the water and
wastewater services.  The Smiths returned to the City Council
with a proposal to construct a new road rather than using Thorpe
Avenue to access Grice Brook, which it accepted.  On May 18,
1989 the City issued water and wastewater allocations for the
Grice Brook project.

The construction of the proposed road triggered the need
for the master plan.  After several failed attempts, the Smiths
presented a plan in 1994 that won agreement from the various
agencies involved.  The master plan broke the farm into five
smaller parcels with different zoning designations: the south
parcel (Commercial C zoning district), the west parcel
(Commercial C and Residential zoning district), the east parcel
(Agricultural/Rural and Recreation/Conservation zoning
district), the south central parcel (Commercial C zoning
district) and the central parcel (Commercial/Residential and a
Commercial zoning district).  The south central parcel is the

part of the Smiths' property that is at the center of this lawsuit.  The City did not assert any objection to the master plan.

During the Act 250 process for Grice Brook and while developing the master plan for the rest of the farm, the Smiths proposed a nine-unit condominium project that was exempted from the master plan with a company called Hanley Lane.  The Smiths presented the Hanley Lane project to the City Planning Commission in the spring of 1989.  Once again Mr. Deslauriers, now an Alderperson, led opposition to the project, which was in his neighborhood.  On August 21, 1989 the City Planning Commission, after holding two meetings, voted not to recommend approval of water and wastewater allocations for the project to the City Council.  At the same meeting, the City Planning Commission voted to recommend approval of another project seeking a wastewater allocation proposed by Robert Cioffi, brother to the City Manager at the time.

Many years before the moratorium at issue in this case was enacted, the City Council discussed a different moratorium on allocations in 1989 while the Robert Cioffi project was before it.  The Council approved the Robert Cioffi project and then recessed without considering the Hanley Lane project.  As a result, Hanley Lane was affected by the 1989 moratorium while the Robert Cioffi project was not.  That moratorium was to be in

effect until January 1, 1990 and after it was enacted the City denied the Smiths' application for a water and wastewater allocation for the Hanley Lane project.  Mr. Deslauriers did not recuse himself.

The Smiths filed a lawsuit against the City in state court claiming that the Board of Alderpersons' denial of their application for the Hanley Lane project was improper because: 1) the denial was an impermissible attempt to impose zoning requirements outside the City, 2) the City was improperly attempting to control land use when it did not have a duly adopted sewer policy, 3) the City acted in a discriminatory manner in allocating wastewater capacity, and 4) that the denial was void because of participation of an alderperson with a conflict of interest.

The Smiths received a favorable ruling on May 17, 1994. The state court held that the City had discriminated against the Smiths by granting the application of a similarly situated applicant, the Robert Cioffi project, while denying their application.  The City's expressed reasons did not relate to wastewater capacity concerns, but rather collateral matters including traditional zoning concerns of traffic and housing density.  The City's attempt to indirectly zone outside of its borders did not represent a reasonable basis for differentiating the Smiths' project and the Robert Cioffi project.  The City

7

Alderpersons, the court held, abused their discretion.  The Smiths were granted a wastewater allocation for the Hanley Lane project.  However, they ultimately never used it because the owner of Hanley Lane had relocated and was no longer interested in construction in the area.

In light of all the interactions between the Smiths and the City, the Smiths also filed a second lawsuit for damages related to the City's treatment of the Grice Brook project.  The Smiths sought a reversal of the City's initial refusal to grant an allocation for the Grice Brook project.  On September 23, 1997 the court relied on the same reasoning as the first state court decision and held that the City's denial was improper because it was based on the City's planning and zoning process rather than concerns related to wastewater capacity.  The state court awarded damages for the cost of constructing Grice Brook Road, loss of contracts, loss of income, and interest for that period.

### B. Infrastructure Construction at Grice Brook

The Grice Brook project went forward in 1995.  When the Smiths were ready to hook on to the City lines Mr. Smith contacted Mr. Cioffi, who arranged to have a preconstruction meeting on site.  Although the easiest and most direct way to hook up the sewer line for the Grice Brook project would have been to connect to lines that ran along Thorpe Avenue, Mr. Cioffi directed the Smiths to hook on to a manhole that was on

8

Burnell Terrace.  The line between the two manholes was in poor condition.  Mr. Cioffi wanted the Smiths to reconstruct that line from Burnell Terrace through private residences to Thorpe Avenue.  He also wanted them to repair and install a new line to the four private residences.  These residences then became new water and wastewater customers of the City.  The Smiths were required to pay for the final grading and landscaping of those properties under the supervision of the City's Public Works Department.

The existing line on Thorpe Avenue was at a depth of only seven feet.  The new line the Smiths put in was at twelve feet. By beginning at twelve feet and replacing the line with a ten-inch main, the Smiths were able to achieve a depth of fourteen feet by the time they got to Thorpe Avenue.  The benefit of this depth was that the manhole could eventually service the entire farm.  Mr. Smith agreed to go to the extra expense to rebuild the City's sewer line in exchange for the ability to achieve this depth.  If Mr. Smith had intended to hook up the water and wastewater for only the Grice Brook project, they would not have had to dig the new line and install the two new manholes.  The ten-inch main was also not necessary to service Grice Brook's needs.

Mr. Smith and Mr. Cioffi discussed Mr. Smith's desire to service further development in the future.  Mr. Cioffi suggested

or recommended the ten-inch pipe based on what Mr. Smith described as his needs for the future development of the farm. Mr. Cioffi gave Mr. Smith advice about how to accomplish that goal.  Mr. Cioffi did not direct Mr. Smith to install a ten-inch line.

### C. The South Central Parcel

The Smiths eventually proposed to develop the south central parcel defined in the master plan, which is located in a growth center designated by both the Regional Planning Commission and the Town of St. Albans.  The Smiths worked with the St. Albans Cooperative Creamery, a dairy farmer's co-op that wanted to build a farm store in the area.  This project was referred to as the Milk and Maple project.  Once again the Smiths went through the Act 250 process, but the application covered the entire south central parcel, not just the Milk and Maple project.  The Smiths asked for and received an allocation from the City, but only for the first building in the development.  When Mr. Smith spoke to Mr. Cioffi about the project he told him that he was extending the ten-inch line but that the immediate need for an allocation was only for the one store building.

During the Act 250 process, however, Mr. Smith represented that the City would provide water and wastewater services to the whole development on the south central parcel.  The Smiths received an initial Act 250 Land Use Permit for the south

10

central parcel on March 12, 2003.  The permit covered the construction of the farm store but also approved another five buildings.  However, it included conditions on construction that were not in the direction that the Smiths had envisioned for the rest of the parcel.  Moreover, the Commission initially approved only 120,000 square feet of commercial development, which was less than the Smiths wanted.

The Smiths appealed the permit to the Environmental Board and requested that they amend it and change the conditions for all the buildings in the parcel.  They submitted a formal proposal referred to as a recess memorandum that described the village concept they originally envisioned.  The Smiths also proposed 268,000 square feet of development.  The Environmental Board approved the Smiths proposals on January 23, 2004 and incorporated their revised landscape and architectural standards from the recess memorandum into the Land Use Permit.

After all the permitting was in place the Smiths began construction, including extending water and sewer lines into the project from the infrastructure leading from Burnell Terrace. It cost $437,770.76 to extend the infrastructure originally constructed for Grice Brook, which included maintaining the fourteen-foot depth for the entire distance and using a ten-inch pipe.  If the Smiths had envisioned constructing only one

building they would not have constructed the line at all because it would not have been cost effective for so little usage.

Mr. Smith did not get water and wastewater allocations that would satisfy his plans for all the buildings he ultimately intended to construct in the south central parcel because he did not know how much capacity he would end up needing in total. Moreover, if Mr. Smith requested an allocation but did not immediately use it he would have to pay the interest on the value of the allocation in the meantime.  If the allocation was never used at all, then after three years it would revert back to the City.  In practice, therefore, he only requested an allocation for a building if he intended to use the allocation immediately or very soon after he received it.  When the Smiths had a concrete plan for a new building they intended to amend the permit to show the actual size and scope of the building and the allocation needed.  There is no documentation from the City, however, granting or reserving future allocations for water or wastewater for the south central parcel, nor did Mr. Cioffi guarantee any.

### D. Creation of the Sewer District

Around the same time that the Act 250 proceedings for the south central parcel were taking place, the Town sought to borrow money to service sewer lines along Route 7 North.  The Town presented a bond to its voters, which passed.  After the

12

bond was approved the Town adopted a sewer ordinance on August 28, 2001.  The ordinance defined the geographic parameters of the sewer district.  The sewer district is in the Town of St. Albans.  Like the south central parcel, it is located in another designated growth center in the Town.

The City initially allocated 100,000 gallons per day of wastewater capacity to service the sewer district, some of which was then allocated among the parcels in the district as a base allocation.  The ordinance provides that property owners can apply for increases to their base allocations from uncommitted reserve capacity for individual buildings.

The Town does not own the land in the sewer district. Landowners pay annually into the repayment of the loan.  Each of the parcels is assigned a portion of the bond service that it must carry in order to pay for the sewer infrastructure.  The Town got an Act 250 permit for the construction of the line to the sewer district on November 21, 2002.  That infrastructure cost approximately $600,000 and was installed in 2004, about a year after the Smiths put their infrastructure in.

The sewer district is, in essence, a way to finance the extension of the sewer line.  The Town never granted any allocation to any parcel.  Rather, property owners in the sewer district receive new or increased allocations by applying directly to the City.

13

### E. The 2011 Moratorium

There has been tension between the City and the Town over water and wastewater services for years. The two municipalities engaged in a failed mediation as well as a contentious lawsuit over the terms under which the City would provide water and wastewater to the Town.

On April 13, 2011 at a special meeting the City Council first considered an emergency ordinance enacting a moratorium on water and wastewater allocations outside of the legal limits of the City. The City enacted the emergency ordinance under its charter authority and then gave the community time to respond. On May 2, 2011, at another special meeting, the City Council conducted a public hearing and ultimately accepted the ordinance enacting the moratorium. Interested parties were given the opportunity to be heard but there is no indication that any of the Smiths attended the public hearing or protested the moratorium.

The moratorium contains a description of the reasons for its enactment, which include concerns about: a lack of a long term equitable agreement for sharing in the capital infrastructure investment by the receiving community or to share in the benefits of the increased tax base of the receiving community, the Town's lack of any obligation to help upgrade the plant to accommodate demands of its residents, the demands of

14

regulatory agencies to reduce phosphorous emissions at the wastewater treatment plant and the associated future upgrade costs resulting from those demands, and tax base erosion.

The minutes of the City Council meeting indicate that the moratorium was enacted as a last resort after the failed mediation between the City and the Town.  It was supposed to be a temporary solution to a long-term problem in City-Town relations.  There is some suggestion that the moratorium might encourage a merger between the two municipalities in the future.

The minutes reflect a clear intention to continue to honor any other allocations on the books at the time the moratorium was enacted, including the reserved allocation to the sewer district.  The City followed through with its intention. Allocations that had not yet expired were and are still honored as long as they were renewed prior to their expiration (including Mr. Smith's existing allocations).

It is clear that the moratorium itself was not motivated by any type of animosity or ill will toward the Smiths or any other individuals.  The Smiths were simply not even considered in any way.  The City meant to strengthen its negotiating position with respect to the Town, to encourage development within its limits, and to improve its overall economic health.  It used the moratorium as leverage against the Town, not the Smiths.

Neither the text of the ordinance enacting the moratorium nor the minutes of the City Council meetings explain why the sewer district was excluded.  However, according to City Manager Dominic Cloud he (or possibly another member of the drafting staff) recognized the long-standing reserved allocation of 100,000 gallons per day to the sewer district through years of practice.  The sewer district was excluded because, in his view, its allocation had been on the books for a decade and should continue to be honored.  The Town passed a bond and had been taxing all the people in the sewer district to pay the debt service on the bond.  There had also been a substantial amount of private investment under the belief that this was a legitimate governmental organizational model and the City would continue to provide service to the sewer district under the terms of the initial allocation.  The City wanted to redefine its relationship with the Town but it never wanted to stop providing water and wastewater in the Town all together.  The City has therefore granted new allocations to property owners within the sewer district since the moratorium was enacted.

Mr. Cloud was the City manager when the moratorium was enacted.  Mr. Cioffi, the City manager at the time the sewer district was created, was not consulted.  None of the individuals responsible for enacting the moratorium were involved or present when the sewer district was created.  The

16

City conducted no investigation into the status of the reserved allocation to the sewer district.  The City believed that its existing and ongoing obligation to provide service to the sewer district under the terms of the City's initial reservation of 100,000 gallons per day was still valid.

However, during discovery in the course of this litigation the City realized that its initial allocation had expired two years after it was issued on December 31, 2002.  When the moratorium was enacted no one on the City Council knew that the allocation had expired.  The land use permit for the sewer district included a requirement that prior to the expiration of the city's wastewater reservation that the permittee would file an updated commitment letter from the City for the 100,000 gallons per day but the City never did so.

No one questioned the legitimacy of the allocation to the sewer district nor did the City conduct any parcel-by-parcel analysis of any other property outside of the sewer district, including the Smiths' property.  Just as the Smiths were not considered when enacting the moratorium they were not considered when creating the exception for the sewer district.  The City viewed the sewer district as a *sui generis* creation of another government for which it had already reserved a very large allocation.  The moratorium was meant to be a blanket policy covering *new* allocations.

17

Mr. Cloud agreed that the City could have in theory charged extraterritorial users whatever amounts might have been needed to take care of the City sewer infrastructure but explained that there were several reasons why the City did not choose to go that route.  Essentially the City wanted a more equitable arrangement in their role as a business and a more competitive position in the economic marketplace.  Until there is an agreement between the two governmental entities, Mr. Cloud felt he could not in good conscience recommend that the City continue to subsidize another community's growth at the expense of development within the City.

### F. The Hampton Inn Project

As described above, the Smiths invested in the water and sewer infrastructure for the south central parcel in anticipation of being able to further develop the lots there. Eventually the Smiths received an offer on another lot from John P. Larkin.  Mr. Larkin wanted to use the lot to build a hotel, specifically a Hampton Inn.  The Smiths informed Mr. Larkin that the south central parcel was an approved development and had gone through the Environmental Board.  Mr. Larkin expressed interest in purchasing a lot in the development and Mr. Smith set the price at $500,000 for two acres.  Mr. Larkin offered $475,000, which was much higher than previous sales in the $150,000 per acre range.  The offer was high because Mr. Larkin

wanted to be near the interstate and in all likelihood the proposed hotel would be the only one in the area.

Mr. Larkin placed contingencies on the contract that required Town approval and a water and wastewater allocation from the City.  The contract between Mr. Larkin and Ingleside was dated July 2012.  When Mr. Smith entered into the contract he was aware that the moratorium was in place but nevertheless went forward with Mr. Larkin because he believed that the City was aware that the Smiths were relying on the use of the water and sewer line to develop the south central parcel.  Mr. Smith also knew that the moratorium excluded the sewer district.  He thought he should not lose the opportunity for the valuable contract with Mr. Larkin because of a moratorium he believed was as discriminatory as the previous moratorium over which he successfully sued the City.

Mr. Smith applied for a water and wastewater allocation for the Larkin hotel on August 24, 2012 but he never received a decision.  On January 14, 2013 he sent a certified letter to the City Manager inquiring into the status of the allocation.  On January 31, 2013 the City Manager replied by letter denying Mr. Smith's request because of the moratorium on new allocations outside the City limits.

## II.  Conclusions of Law

The Equal Protection Clause has traditionally been applied to governmental classifications that treat certain groups differently than other groups.  *Fortress Bible Church v. Feiner*, 694 F.3d 208, 221 (2d Cir. 2012).  In *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam), the Supreme Court formally affirmed the existence of a "class of one" equal protection claim in which a single individual can claim a violation based on arbitrary disparate treatment.  The Court explained that the "purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination."  *Id.* (internal quotation omitted).  Class of one claims are proper when plaintiffs can demonstrate that they have been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.  *Id.*

Class of one plaintiffs must show an "'extremely high degree of similarity'" between themselves and the others to whom they compare themselves.  *Ruston v. Town Bd. For Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010) (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)).  Accordingly, to succeed on a class of one claim, a plaintiff must establish:

> (i) no rational person could regard the circumstances of
> the plaintiff to differ from those of a comparator to a
> degree that would justify the differential treatment on the
> basis of a legitimate government policy; and (ii) the
> similarity in circumstances and difference in treatment are
> sufficient to exclude the possibility that the defendants
> acted on the basis of a mistake.

*Ruston*, 610 F.3d at 60.  The purpose of requiring a comparator

of sufficient similarity is to make sure that no legitimate

factor could explain the disparate treatment.  *Fortress Bible*

*Church*, 694 F.3d at 222.  The existence of persons in similar

circumstances who received more favorable treatment provides an

inference that the plaintiff was "intentionally singled out for

reasons that so lack any reasonable nexus with a legitimate

governmental policy that an improper purpose—whether personal or

otherwise—is all but certain." *Clubside*, 468 F.3d at 159.[3]

The Court must first determine whether the Smiths' property

and the sewer district are sufficiently similarly situated.

Ingleside argues that two government policies interact to

arbitrarily treat it differently from the sewer district.  The

first policy is the moratorium itself, which was the ultimate

---

[3] Because this case involves a government exercising its power to
regulate as a lawmaker rather than acting as a proprietor to
manage its internal operations, this is not a case involving
inherently discretionary decisionmaking that does not violate
the Equal Protection clause.  *See Johnson v. Pallito*, No. 2:12
CV 138, 2014 WL 1922728, at *2-3 (D. Vt. May 14, 2014).
Moreover, the Court has already held that it will decline to
require Ingleside to prove "vindictive action, illegitimate
animus, or ill will" in order to succeed on its class of one
claim.  *See* ECF No. 35 at 17 n.1.

reason that the City denied Mr. Smith's request for the allocation at issue in this case.

Ingleside argues that the moratorium violates the restrictions imposed by 24 V.S.A. § 3616.  According to Ingleside, the moratorium represents the City's attempt to exercise power not within the province of local self-government and is thus *ultra vires* and consequently void.  The City does not address this argument directly except to argue that the enactment of a moratorium involving sewer allocations is a governmental, discretionary action within the authority of the City Council to enact.  The only claim currently before the Court is Ingleside's equal protection claim.  *See* ECF No. 35 (granting summary judgment to the City on Ingleside's state law claims but denying summary judgment as to Ingleside's Equal Protection claim).  However, the Court does not conclude that the City only enacted the moratorium in order to divert revenue from its sewer system into its general fund or to avoid the restriction in 24 V.S.A. § 3616.  The reasons behind the moratorium are subtler and more complex.  In particular the City wanted to attract the kind of development that was previously taking place in the Town because water and wastewater services were readily available there.  Accordingly, the Court declines to find that the moratorium is void.

There is no evidence suggesting that the Smiths were in any way involved or even considered when the City enacted the moratorium; it simply had nothing to do with them. The moratorium was enacted for a variety of reasons that pertained to years of unresolved tension between the Town and the City and a desire to increase the City's negotiating power when they redefined their relationship going forward.

Apart from the exception for the sewer district, which the Court will address next, there is no evidence suggesting that the moratorium itself has been applied inconsistently or discriminatorily. For example, there is no evidence that any similarly situated property owners outside of the sewer district have received a water or wastewater allocation from the City since it was enacted, nor is there any evidence that any of Mr. Smith's or other Town residents' duly-extended pre-existing allocations have not been honored. Although Ingleside might have preferred the City try to manage its relationship with the Town by charging extraterritorial users a higher surcharge instead of enacting the moratorium, the City had rational reasons for choosing the path it did. The moratorium itself is a legitimate exercise of the government's power.

The second government policy at issue in this case is, of course, the exception contained within the moratorium. Ingleside argues that its property is similarly situated to the

23

properties in the sewer district and that excepting the sewer district but not the Smiths' property has resulted in the City treating the Smiths arbitrarily.

The Court acknowledges that there are indeed many qualities that the sewer district and the south central parcel have in common.  Both contain multiple lots which are zoned for commercial use and are located in designated growth districts. Both required Act 250 approval to build infrastructure.  Both property owners in the sewer district and Mr. Smith applied to the City directly to receive individual allocations.  And both spent a significant amount of money (albeit through different funding mechanisms) on infrastructure with the expectation that they would continue to receive water and wastewater service from the City in the future.

Despite these similarities there is one significant difference between the Smiths' property and the sewer district that prompts the Court to conclude that the two are not similarly situated.  The sewer district had what the City believed was a long-standing reservation of an allocation of 100,000 gallons per day.  The City clearly intended to continue to honor all allocations that pre-dated the enactment of the moratorium and the sewer district's allocation was no exception.

Mr. Smith, on the other hand, chose to request allocations building by building in order to avoid paying interest on an

24

allocation he would not use immediately.  The City, through Mr.
Smith's conversations with Mr. Cioffi, seems to have been aware
that Mr. Smith intended to develop the entire south central
parcel using City water and wastewater connections.  However, he
did not have a large-scale allocation comparable to the sewer
district's allocation at the time the City considered the
moratorium, nor did the City make any kind of promise with
respect to future allocations.

The unique nature of the reserved allocation to the sewer
district makes its exception from the moratorium reasonable.
The City felt bound to avoid interfering with its longstanding
treatment of that special district and what it believed to be a
valid allocation.  Perhaps the City can be accused of failing in
its due diligence, but the fact the allocation technically
expired is not fatal to the City's case.

The Court concludes that the sewer district and the Smiths'
property were not similarly situated.  This alone would be
sufficient to find in favor of the Defendant but *Olech* also
requires a plaintiff to demonstrate that the defendant's action
was intentional.  *Giordano v. City of New York*, 274 F.3d 740,
751 (2d Cir. 2001) (explaining a "class of one" plaintiff must
show not only "irrational and wholly arbitrary acts" but also
"*intentional* disparate treatment") (quoting *Olech*, 528 U.S. at
564-65).  There is simply no evidence that the City

25

intentionally treated the Smiths differently from any other property owner.  As discussed above, the Smiths were not even considered when the moratorium was being drafted or debated.

The Court concludes that the City had a legitimate reason to exempt the sewer district but not the Smiths' land from the moratorium and that the Smiths were not intentionally discriminated against in any way.  The City's differential treatment of the two was the result of a legitimate government policy and had a rational basis.  Accordingly, the Ingleside's equal protection claim must fail.

Dated at Burlington, in the District of Vermont, this 3rd day of March, 2015.


/s/ William K. Sessions III
William K. Sessions III
District Court Judge